## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LARISA NIKOLAEYVNA SPELIC,

       *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant*.

_____/

CASE NO. 15-11029

DISTRICT JUDGE LAURIE J. MICHELSON
MAGISTRATE JUDGE PATRICIA T. MORRIS

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
### ON CROSS MOTIONS FOR SUMMARY JUDGMENT
### AND EMERGENCY MOTION (Docs. 19, 23, 24)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Spelic is not disabled. Accordingly, **IT IS RECOMMENDED** that Spelic's Motion for Summary Judgment (Doc. 19) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 24) be **GRANTED**, and that Spelic's Emergency Motion (Doc. 23) be **DENIED AS MOOT**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq.* (Doc. 3; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 19, 24).

Plaintiff Larisa Spelic was fifty years old when she applied for benefits on June 29, 2012. (Tr. 138). This application was denied on September 26, 2012. (Tr. 83). Spelic requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Anthony Smereka on September 23, 2013. (Tr. 43-71). Spelic, represented by attorney Philip Fabrizio, testified, as did vocational expert ("VE") Annette Holder. (*Id*.). On November 6, 2013, the ALJ issued a written decision in which he found Spelic not disabled. (Tr. 24-37). On January 23, 2015, the Appeals Council denied review. (Tr. 1-3). Spelic filed for judicial review of that final decision on March 19, 2015. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

2

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Spelic not disabled under the Act. (Tr. 37). The ALJ found at Step One that Spelic had not engaged in substantial gainful following the alleged onset date, June 20, 2011. (Tr. 29). At Step Two, the ALJ concluded that Spelic had the following severe impairments: "tendonitis of the left shoulder; adjustment disorder with depression; and episode of psychotic disorder, not otherwise specified." (*Id.*). At Step Three, the ALJ found that Spelic's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 30-32). The ALJ then found that Spelic had the residual

4

functional capacity ("RFC") to perform light work, except that Spelic "should not work with the general public; limited to unskilled work; able to learn by demonstration with limited reading involved." (Tr. 32-36). At Step Four, the ALJ found that Spelic was able to perform her past relevant work as a housekeeper. (Tr. 36-37). As a result, the ALJ found Spelic not disabled under the Act. (Tr. 37).

### E.   Administrative Record

#### 1.   Medical Evidence

As will be further explored below, Spelic, who proceeds in this matter *pro se*, does not offer any specific critique of the ALJ's interpretation of the medical evidence or application of legal standards. (Doc. 19). Spelic comes closest to raising a relevant argument by noting that she is "substantially limited in the major life activity [sic] of sitting, pushing, lifting, standing, bending, walking, standing [sic]," and that "Dr. Chang and physical therapist Dr. Debra Van Ort provides an important part on evidence." (*Id.* at 1-2). Raising a claim in a perfunctory manner generally results in waiver of such arguments. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). However, given Spelic's *pro se* status and the Court's obligation to determine whether the ALJ's decision is supported by substantial evidence, it will nevertheless "review[] the administrative record for obvious errors in order to 'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record.'" *Crist v. Comm'r of Soc. Sec.*, No. 13-CV-14008, 2014 WL 2931412, at *2 (E.D. Mich. June 27, 2014) (quoting *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005)).

5

In June 2011, Spelic was involved in a motor vehicle accident. Spelic's descriptions of this accident differ throughout her transcript. On May 2, 2012, Spelic told a physician that she was buckled in a moving truck and was reversing the vehicle when the "brakes gave out and she hit a truck and the truck hit her." (Tr. 257). On May 25, 2012, Spelic told another doctor that she was "involved in a freak accident . . . when while backing her truck, it hit a tree." (Tr. 218). In June 2013, Spelic described the accident as having "caused her injuries and changed her life after almost killing her," but did not wish to speak about the details of the accident. (Tr. 323).

On July 20, 2011, Spelic treated with chiropractor Baron Holt, who recorded complaints of "[s]evere frequent aching, sharp, and radiating pain, rating a 8 on a 0-10 scale." (Tr. 334). Holt noted some tenderness and "fixation" in the spinal muscles, and noted complaints of "very tolerable pain" when dressing, lifting, pushing, sitting, or standing, along with "moderate pain" when driving, pushing, and moving from sitting to standing, and "very severe pain" when concentrating, gardening, recreating, shoveling, carrying, climbing, and performing other strenuous activities. (*Id*.).

On January 19, 2012, Spelic underwent an MRI to diagnose back pain. (Tr. 206). Dr. Zongli Chang noted broad-based herniation at L2-3, producing impingement on the ventral margin of the thecal sac, along with mild disc displacement at L2-L5 and L5-S1. (Tr. 207). Her thoracic spine was normal. (Tr. 209). Her cervical spine showed disc displacement without canal or foraminal stenosis at C6-7. (Tr. 210).

6

On February 9, 2012, Dr. Daniel B. Michael noted that Spelic was "anxious and tend[ed] to cry at times," and that she "speaks English well and her mentation appears otherwise intact." (Tr. 232). Spelic had normal strength and tone in three of her four limbs, but showed "lack of effort when testing the muscles of the left upper limb." (*Id.*). He also noted that MRIs of her cervical, thoracic, and lumbar spine appeared "unremarkable," except for "mild lumbar spondylosis with minimal disc bulge." (Tr. 232). Dr. Michael concluded that Spelic had "musculoskeletal type pain and discordant neurologic exam without any hard findings," that she "does not require any further neurologic investigation or surgical intervention," but that she might benefit from "injection therapy and counseling along with continued physical therapy." (Tr. 232).

On February 23, 2012, Dr. Michael found that Spelic's asserted symptoms "did not coincide to any finding on her cervical, thoracic, or lumbar spine MRIs," that she "has musculoskeletal pain discordant with her neurologic exam and without any hard neurologic findings," and he "reaffirmed that she does not require any further neurologic investigation or surgical intervention," apparently suggesting that Spelic was not suffering from any determinable malady which would merit treatment. (Tr. 230).

On March 23, 2012, Dr. Henry Tong recommended that Spelic avoid surgery and spinal injections at that time, in the hope that Spelic's pain would improve with chiropractic therapy. (Tr. 229). Spelic reported that she experienced pain at an average severity of six out of ten over the prior week. (Tr. 228).

On April 12, 2012, Spelic underwent an MRI scan to diagnose the cause of her left shoulder pain with decreased range of motion. (Tr. 205). Dr. Zongli Chang diagnosed supraspinatus tendinitis, with mild hypertrophic changes of the acromioclavicular joint. (Tr. 206).

On April 21, 2012, Spelic treated with Dr. Henry Tong. (Tr. 224). Dr. Tong found that Spelic suffered from "diffuse" pain and thus was not appropriate for injections, that surgery was unnecessary, and recommended further physical therapy and chiropractic treatment. (Tr. 226). Spelic reported pain averaging at five out of ten in the prior week. (Tr. 225).

On May 2, 2012, Dr. Stephen Mendelson noted that Spelic complained of "lots of problems and pain with essentially all activities," and noted that "[t]his is a most confusing situation" because Spelic was "scattered in her thought and tangential," including shuffling through papers and having difficulty concentrating. (Tr. 258). His "gut feeling" was that Spelic suffered from "some neuropsych issue that is overlaying all matters here," which he characterized as of "highest concern." (*Id.*). He also concluded that "her claim," apparently referencing her upcoming disability claim, was "extremely difficult to assess." (*Id.*). Finally, he concluded that Spelic's shoulder problem was "not . . . something . . . that would require a surgical intervention." (*Id.*).

On October 10, 2012, Dr. Chang prescribed physical therapy and drafted an essential services letter, recommending Spelic be granted home care and essential services from October to November 2012. (Tr. 220-21). Dr. Chang also completed a check-the-box form in which he appears to diagnose Spelic with cervical strain, cervical radiculopathy, lumbosacral strain, disc

displacement, herniated discs, lumbar disc displacement, difficulty walking, a sprained shoulder, and prescribed Vicodin. (Tr. 222).

December 31, 2012, marks Spelic's date last insured under the DIB program. (Tr. 2). In order for evidence of the claimant's condition after the date last insured to be relevant, the evidence "must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003).

On January 20, 2013, Spelic was admitted to the hospital for delusional beliefs. (Tr. 293). She complained of "some low back pain," but was in "no apparent physical distress." (*Id.*). She was assessed with "[p]sychiatric disorder;" at that time her plan did not include a prescription or course of treatment for her mental health. (*Id.*). She was assessed on January 21, 2013, and was diagnosed with anemia and hypothyroidism. (Tr. 295). She was assessed again on January 27, 2015, complaining of cold sores. (Tr. 296). On February 6, 2013, Spelic was discharged from the hospital; Dr. Syng Yoon prepared a discharge summary. (Tr. 291). Spelic was paranoid, somatic, and delusional, asserting that "the FBI was out to get her." (*Id.*). She refused medication, stating "I am doing perfect," but was given medication intra-muscularly regardless. (*Id.*). On discharge she was alert and oriented, denied the desire to harm herself or others, and denied hallucinations. (Tr. 292). Spelic was diagnosed with psychotic disorder, not otherwise specified. (*Id.*). It was noted that a GAF score of 40 was assigned on admission, which was upgraded to 52 upon discharge. (*Id.*).[1]

---

[1] A GAF score of 31 to 40 indicates some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child

9

On February 15, 2013, D.O. David Lustig noted Spelic's complaints of pain throughout her neck and left upper extremity, low back pain, paresthesia of the left half of the face, difficulty working and driving, "difficulty finding a 'man,'" along with left leg weakness. (Tr. 289). D.O. Lustig noted that "[m]ental status examination was essentially unremarkable," that Spelic's "language, cognition and writing were all well preserved." (Tr. 290). He found that Spelic's motor system revealed adequate strength, tone, and coordination, including in her upper extremities. (*Id.*). D.O. Lustig concluded that "the examination was essentially unremarkable," that Spelic suffered from "no objective neurological deficits on examination," and that Spelic's "symptomatologies are basically soft tissue in nature." (Tr. 290).

On June 28, 2013, D.O. Christine Ryan noted that Spelic "was very addiment [sic] that this [appointment] was about her [blood pressure] really only," that she "does not want to be on any medication," did "not want to talk about the accident that caused her injuries and changed her life after almost killing her," and that she was experiencing pain. (Tr. 323).

On July 26, 2013, D.O. Lustig noted complaints of low back, knee, and upper left extremity pain. (Tr. 325). The primary discussion involved abnormal blood pressure tests and anemia. (*Id.*).

On August 6, 2013, Spelic underwent a pre-placement test at Concentra Health Services, apparently in anticipation of physical therapy. (Tr. 328). These tests showed that Spelic experienced some difficulty with lifting and pushing and pulling fifty pounds, repetitive

---

frequently beats up younger children, is defiant at home, and is failing at school). Diagnostic & Statistical Manual of Mental Disorders–Text Revision 32 (4th ed. 2000) ("DSM–IVTR"). A GAF score of 51 to 60 is indicative of an individual who has moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

kneeling, and squeezing thirty-five pounds, but was able to climb three steps while carrying fifteen pounds ten times in under five minutes, and was able to bend to pick up three pounds from the ground ten times in five minutes. (Tr. 328). Handwritten notes appear to record that Spelic refused to complete the lifting and pushing and pulling tests because the weight was "too heavy." (*Id.*).

On September 19, 2013, Spelic treated with D.O. Christine Ryan, who noted complaints of depression and stress. (Tr. 329).

On October 25, 2013, D.O. Ryan noted continued "complain[ts] of debilitating pain, anxiety, frustration, and generalized weakness." (Tr. 330). Spelic was found to be positive for myalgias, back pain, arthralgias, and a gait problem; psychologically, she was "[p]ositive for weakness," though the meaning of this finding is unclear. (*Id.*). D.O. Ryan also noted that Spelic was "in to have medical history updated to actual diagnoses and not patient reported diagnoses for her disability lawyer," apparently noting a disparity between Spelic's complaints and her diagnosed conditions. (*Id.*). D.O. Ryan also noted that Spelic was "[a]ngry, very loudly passionate about her concern, but apologize[d] often during [the] appointment." (Tr. 332).

###   2.   Medical RFC Assessments

On May 25, 2012, Spelic underwent a neuropsychological evaluation with Dr. Firoza B. Van Horn, Psy. D. (Tr. 211-19). Dr. Van Horn noted that Spelic complained of back pain following a car accident in which a truck she was driving rolled into a tree, though she did not seek medical attention following the accident. (Tr. 211-212, 218). Spelic also alleged generalized pain, numbness and tingling on her left side, poor memory, and depression. (Tr.

212). She also complained of nightmares about the event, and reported that she was "diagnosed with 'Propable PTSD.'" (*Id*.). While Spelic asserted that she lost consciousness during the accident, Dr. Van Horn noted that her memory of events before, during, and after the crash showed that she did not lose consciousness. (Tr. 218). Dr. Van Horn also observed that Spelic drove to the clinic by herself, that her hygiene and grooming were fair, she ambulated without difficulty, but was agitated and demanding, was verbal and difficult to interrupt, and that her "speech was clear and coherent and comprehension was also within normal limits," but that she "spoke with an accent but she did not require an interpreter." (Tr. 214). Spelic attested to numerous symptoms, including dizziness, sleep issues, changes to her gait, vision issues, difficulty with grasping objects, slurring, memory issues, forgetfulness, bladder issues, worries, and loss of balance, among other problems. (*Id*.). Dr. Van Horn found that Spelic scored five out of fifteen on the Rey-Memory test, demonstrating that Spelic "may" have been exaggerating her complaints. (*Id*.). Similarly, results from a DOT Counting Test suggested that Spelic was exaggerating her symptoms. (*Id*.). A "MMP1-2 test" revealed that "there is a significant probability that Ms. Spelic has endorsed the items inaccurately by reporting more symptoms and behaviors than seen in most psychiatric patients." (Tr. 218).

In terms of intellectual functioning, Spelic was found to score in the "Borderline range" of intellectual functioning, low average score in terms of verbal comprehension, producing a borderline score in perceptual reasoning, a borderline score in working memory, and an impaired score in terms of processing speed. (Tr. 214.). Dr. Van Horn concluded that Spelic "does not appear [to have] sustained any cognitive losses," and that her "low score may be due

12

to a language barrier." (Tr. 216). Spelic's reading skills were average, spelling was at a 5.9 grade level, and her arithmetic scores put her at a 12.9 grade level. (*Id*.). Memory tests returned "poor" results. (Tr. 217).

Dr. Van Horn found that Spelic showed blunted affect, that Spelic saw little opportunity to improve her circumstances, was fearful, easily frightened, and generally apprehensive. (Tr. 218). Spelic had difficulties with concentration, attention, and memory. (*Id*.). She also showed some "peculiar experiences and thoughts," blank spells in which she appeared to forget what she was doing, was extremely introverted, and was inappropriate and unpredictable. (*Id*.). Dr. Van Horn concluded that Spelic "did not put forth the effort necessary to obtain valid results," that her scores were inconsistent, and that her assertions of memory problems were likely a fabrication. (*Id*.). However, Dr. Van Horn also noted that Spelic was "having a difficult time coping and this could be due to her physical problems such as pain which most likely directly resulted from the accident." (*Id*.).

On December 19, 2012, Dr. Chang completed a medical source statement. (Tr. 281). He found that Spelic could never lift or carry even ten pounds because of left arm weakness and disc displacement, could sit for one hour, stand for ten minutes, and walk for thirty minutes. (Tr. 281-82). He found that she required a cane to ambulate, could frequently perform all tasks with her right hand, could occasionally reach or feel with her left hand, but could never handle, finger, or push and pull with her left hand. (Tr. 282-83). Spelic could occasionally use her left and right feet for operation of foot controls, could never climb ladders or scaffolds, could occasionally climb stairs or ramps, balance, stoop, kneel, or crouch, and could frequently

13

crawl. (Tr. 284). Spelic could shop, travel without assistance, use public transport, climb a few steps, prepare simple meals, care for hygiene, and sort papers, but could not walk a block at a reasonable pace on uneven surfaces. (Tr. 286).

### 3.   Application Reports and Administrative Hearing

#### a.   Spelic's Function Report

On August 9, 2012, Spelic completed a function report. (Tr. 168-75). On that date, Spelic reported that she was unable to work because of issues with her knees, back, and shoulders, along with anxiety, weakness, pain, depression, "acute posttraumatic headaches," and difficulty walking. (Tr. 168). Under the heading of personal care, she asserted that she performs all such activities "slow[ly]." (Tr. 169). She prepared sandwiches for meals, and did so "not often;" she did "a little laundry," but asserted that doing so took her longer; other chores were performed by her daughter. (Tr. 170). Spelic asserted that she went outside "not often," but did go shopping, and asserted that she could handle money. (Tr. 171). She reported having no hobbies, and the only location she visited was her doctor's office; she required reminders and accompaniment. (Tr. 172). Her "short memory" caused difficulty interacting with others," and she reported that she did not do "anything" because of her illnesses. (Tr. 173). She reported difficulty with concentration and following instructions. (*Id.*). Spelic asserted that she uses a brace to walk, and required the brace to "do anything." (Tr. 174).

On September 25, 2013, Spelic's daughter completed a third party function report in which she generally confirmed the assertions made in Spelic's own function report. (Tr. 190-

14

97), except insofar as she asserted that her mother enjoys watching movies and reading, and could pay attention for one and one half hours. (Tr. 194-95).

### b.   Spelic's Testimony at the Administrative Hearing

At the September 23, 2013, hearing before the ALJ, Spelic stated that she understood "some of" the ALJ's statements, but requested a translator. (Tr. 45). Spelic's attorney stated that he could "understand her," but that "sometimes [he was] suspicious that maybe she's not understanding exactly what [he was] saying," and that Spelic answered questions "just to please" the attorney. (Tr. 46). The ALJ commented that Spelic seemed "pretty fluent" in English, and her attorney concurred, saying "I think she is." (Tr. 47). The transcript further indicates that Spelic answered some of the ALJ's questions directly, and at other times through the translator. (Tr. 55, 57, 61).

Spelic stated that she could lift a gallon of milk with her right arm, but not left arm; she could walk, but if she walked too long she would "get hurt more." (Tr. 54). She could ambulate around her home without a cane, but needed one when leaving home. (*Id.*). She could climb more than five steps to her apartment, but needed to lean on the wall for support. (Tr. 55). She asserted that she performed "only [the] necessary [activities]" during an average day. (*Id.*). However, Spelic was able to drive, and drove herself to her doctor's office. (Tr. 57). Spelic testified that she could stand for ten minutes, but only sit for three minutes. (*Id.*).

Regarding her psychiatric hospitalization, Spelic stated that she was admitted for treatment because of "seizures," and asserted that she was admitted voluntarily. (Tr. 59). In response to why she was psychiatrically hospitalized, she agreed that she believed the FBI was

following her, and said that she "did not understand what[ was] going on around [her] and . . . felt that somebody was following [her]." (Tr. 62). When asked whether she still felt this way, Spelic asserted "I don't know." (*Id.*).

Spelic asserted that she cannot return to her work as a house cleaner because she has "very weak muscles" and because she is in "constant pain." (Tr. 61).

### d.      The VE's Testimony at the Administrative Hearing

The ALJ then asked the VE a series of hypothetical questions to determine whether Spelic is capable of completing competitive, remunerative work. (Tr. 64). First, he asked the VE to assume a person of identical age, education, and vocational history to Spelic, who could perform light work, and specifically who could perform Spelic's prior work as a housekeeper. (Tr. 68). The ALJ then asked whether such a person who cannot perform work "with the upper extremities above shoulder level" could work as a housekeeper; the VE testified that such a restriction would preclude work as a housekeeper. (*Id.*). The ALJ next asked whether a restriction to "no work with the general public would be compatible" with work as a housekeeper; the VE testified that such a restriction would limit the number of jobs, but some office cleaning jobs would be available. (*Id.*). Finally, the ALJ asked whether a limitation to "occasional contact with co-workers and supervisors" would preclude work as a cleaner; the VE testified that it would. (Tr. 68-69). The VE testified that approximately 2000 nighttime cleaning jobs would be available in Southeast Michigan. (Tr. 69).

Spelic's attorney asked whether a requirement that the worker lay down for two hours during an eight-hour workday would preclude competitive employment; the VE testified that it

16

would. (Tr. 69). Similarly, the VE stated that a requirement that the worker use a cane for a majority of the eight-hour workday would preclude work as a cleaner. (Tr. 70).

### F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether

17

the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also*

*Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying

benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an

ALJ may properly reject a treating source opinion if it lacks supporting objective evidence.

*Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*,

51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's

statements about pain or other symptoms with the rest of the relevant evidence in the record

and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a

claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human*

*Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be

disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL

180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.

2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective

symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The

ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of

the underlying condition exists. The ALJ then determines whether that condition could

reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;
    (ii)   The location, duration, frequency, and intensity of . . . pain;
    (iii)  Precipitating and aggravating factors;
    (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)   Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.     Analysis

As noted above, Spelic's motion for summary judgment was prepared *pro se*, and does not contain any discernable argument relating to the ALJ's decision. Spelic references the findings of Dr. Chang and Dr. Van Ort and asserts that she "is substantially limited in the major activity [sic] of sitting, pushing, lifting, standing, bending, walking, standing [sic]." (Doc. 19 at 1-2); while these references in no way constitute actual arguments, the Court will conduct a review of the ALJ's decision and the medical evidence to ensure that no obvious errors were committed. Spelic also raises claims which are irrelevant to the current proceeding and are not properly before the Court, including Americans with Disabilities Act ("ADA") and demands damages for emotional distress. For the reasons discussed below, the Court finds that the ALJ's decision is supported by substantial evidence.

### 1.    The ALJ's Decision Contains No Obvious Errors

First, the Court will consider whether the ALJ's decision suffers from any "obvious errors." *Crist*, No. 13-CV-14008, 2014 WL 2931412, at \*2; *Brown v. Comm'r of Soc. Sec.*, No. 12-14057, 2014 WL 222760, at \*1 (E.D. Mich. Jan. 21, 2014). Social Security appeals filed *pro se* present a unique challenge for the Courts. Courts in this circuit have frequently held that *pro se* plaintiffs seeking review of a Social Security benefits denial are entitled to some level of review even where there is a total failure to file a motion for summary judgment. *See* Brown, No. 12-14057, 2014 WL 222760, at \*1; *Mosely v. Astrue*, No. 2:12-CV-836, 2013 WL 1316013, at \*1 (S.D. Ohio Mar. 28, 2013). However, such plaintiffs are not entitled to expect the Court to act as their attorney; on the contrary, the Court's review in such cases is limited to merely "determin[ing] whether the ALJ's findings are supported by substantial evidence or whether the ALJ made an obvious legal error" *Brown*, No. 12-14057, 2014 WL 222760, at \*12 (E.D. Mich. Jan. 21, 2014), which has also been described as performing a "general review" *Mosely*, No. 2:12-CV-836, 2013 WL 1316013, at \*1. Other districts have noted that courts are not required to "scour the record for every conceivable error." *Elam v. Barnhart*, 386 F. Supp. 2d 746, 753 (E.D. Tex. 2005). Having established that the Court should perform some level of review of the ALJ's decision, the question is then what form that review should take. It would be unnecessary and wasteful to merely repeat the ALJ's findings and conclusion. Yet, on the other hand, it would perhaps be a dereliction of duty to merely assert that the Court reviewed the ALJ's decision and found no obvious errors. Having found no precedent which indicates with specificity the type or depth of review which is required, the Court will examine some of

22

the major elements of the ALJ's decision to determine whether it is supported by substantial evidence.

In terms of mental functioning, the ALJ found mild restriction to Spelic's activities of daily living and social functioning, and moderate limits to Spelic's concentration, persistence, and pace. (Tr. 31). Specifically, the ALJ noted that Spelic experienced no mental restrictions in terms of personal care, was capable of preparing simple meals, doing laundry, driving, and shopping in stores. (*Id*.). Further, the ALJ found that Spelic was verbal and cooperative in her treatment sessions, but that she did not engage in social functions. (*Id*.). Finally, the ALJ noted Spelic's significant paranoia issues, resulting in her admittance to the hospital in January 2013, but nevertheless found that she had only moderate concentration deficits based on her daughter's function report, which stated that Spelic could pay attention for one and one half hours. (*Id*.). He also noted that Spelic experienced one episode of decompensation resulting in greater than two weeks of hospitalization. (*Id*.).

The ALJ's characterization of Spelic's mental health evidence is well supported by the medical record.[2] Spelic's hospitalization for treatment of paranoia is concerning, but post-dates

--------

[2] The Court notes Spelic's motion for summary judgment, which is drafted using language that is difficult to interpret, and frequently includes sentences which are garbled or otherwise meaningless, including phrases like "[r]eporting is ways of describing data, survival analysis in a final," and "[t]his is important to foundation facts by authority with jurisprudence in the negligence that writing transcript is the fact it would be unfair." (Doc. 19 at 1, 3). The content and style of Spelic's *pro se* motion for summary judgment could arguably be viewed as evidence of ongoing mental ailments. However, the Court is ill equipped to render such a medical judgment, and in any case Spelic's occasional difficulties with the English language may be the true cause of this inscrutability. Furthermore, the question before the Court is not whether Spelic currently suffers from mental illness, but instead whether the ALJ's decision,

23

her date last insured, and those records are thus probative only insofar as it sheds light on her condition during her insured period. *Wirth*, 87 F. App'x at 480. As the ALJ properly noted, Spelic's condition improved substantially with the use of psychiatric medication between the time of her admission to and discharge from the hospital. (Tr. 34-35, 292). Further, as the ALJ properly noted, Spelic's treatment records for mental health issues are sparse, and include no further hospitalization or treatment for mental health concerns through the last recorded treatment date in October 2013.[3] (Tr. 35, 290, 323-332).

Even assuming that Spelic was suffering from some degree of mental limitation through her date last insured, the ALJ incorporated sufficient restrictions in his RFC, noting that she "should not work with the general public; limited to unskilled work; able to learn by demonstration with limited reading involved." (Tr. 32-36). Spelic showed signs of substantial anxiousness, depression, and paranoia in several of her treatment sessions. On February 9, 2012, Dr. Michael noted that she was anxious and cried at times (Tr. 232), Dr. Mendelson noted that her thoughts were scattered and tangential on May 2, 2012 (Tr. 258), and as discussed above, she suffered substantial mental distress in January 2013, but her condition improved considerably by the time of her release from hospitalization some two weeks later (Tr. 292). These relatively sparse treatment sessions for mental health concerns support the ALJ's RFC assessment. The ALJ's findings are also supported by Psy D. Van Horn's report, in

---

rendered on November 6, 2013, was supported by substantial evidence. *See Natale v. Comm'r of Soc. Sec.*, No. 607-CV-18-ORL-31DAB, 2008 WL 227957, at *7 (M.D. Fla. Jan. 25, 2008)

[3] On September 19, 2013, Spelic complained to D.O. Ryan of "depression and stress," but apparently received no treatment for these complaints. (Tr. 329).

which she noted that several tests suggested that Spelic was exaggerating her complaints, inaccurately reporting symptoms, and did not put forth sufficient effort to generate valid results. (Tr. 211-18).

The ALJ also fairly characterized Spelic's physical impairments, and appropriately compensated for her demonstrable physical limitations in the RFC, limiting her to light work, which is to say "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." 20 C.F.R. Section 404.1567(b). Spelic asserted at the hearing that she experienced severe pain throughout her body on a constant basis, particularly in her back, knees, and upper left extremity. (Tr. 61, 325). In January 2012 Dr. Chang noted "broad-based herniation at L2-3, producing impingement on the ventral margin of the thecal sac," along with some mild disc displacement in the lumbar spine. (Tr. 209-10). While Dr. Michael noted some weakness in Spelic's upper left extremity in February 2012, he also found that she exhibited a "lack of effort" in testing that limb, and noted that she did not require any further investigation or surgical intervention. (Tr. 232). Later that same month, Dr. Michael noted that Spelic's pain was "discordant with her neurologic exam," indicating that her symptoms were inconsistent with her objective physical condition. (Tr. 230). Dr. Tong also recommended against surgery and injections, and instead suggested conservative treatment in the form of chiropractic therapy. (Tr. 229). In April 2012 Dr. Chang diagnosed supraspinatus tendinitis, but did not describe how this condition affected Spelic's ability to move or work. (Tr. 206). Dr. Mendelson also found that surgical intervention was inappropriate, and seemed

to suggest that Spelic's assertion of "pain with essentially all activities" was inconsistent with his physical examination. (Tr. 258). Spelic complained of pain in several of her treatment sessions through September 2013, though no objective findings support these assertions. (Tr. 293, 289, 323-25, 332). In October 2013 D.O. Ryan noted myalgias, back pain, arthralgias, and a gait problem, but also noted an apparent disparity between Spelic's description of her diagnosed conditions and her actual conditions. (Tr. 330).

Only two medical records give insight into how Spelic's physical condition impacted her ability to work. First, on August 2013, Spelic underwent testing at Concentra Health Services; these tests revealed that she was unable to lift, push, or pull fifty pounds, but could lift and carry fifteen pounds, and could bend to pick up three pounds. (Tr. 328). While the ALJ did not reference this record in his decision, he was not required to do so, and in any case the record provides some evidence of Spelic's ability to lift weight as necessary to perform "light" work.

Second, Dr. Chang found in December 2012 that Spelic could only occasionally reach or feel with her left hand, and could never handle, finger, push, or pull with her left hand. (Tr. 282-83). Further, he found that she was unable to lift or carry ten pounds because of left arm weakness and disc displacement, and that Spelic could only sit for one hour, stand for ten minutes, and walk for thirty minutes. (Tr. 281-82). The ALJ appropriately addressed Dr. Chang's findings, noting that he appears to have relied heavily on Spelic's complaints rather than objective observations, particularly given the sharp disparity between Dr. Chang's suggested degree of limitation and the mild findings made by other orthopedic specialists in the

26

record. (Tr. 30, 35). The ALJ further noted an apparent inconsistency within Dr. Chang's own findings, namely that Spelic had three or four out of five strength in her left hand, but also concluding that she was unable to lift even ten pounds with that limb. (Tr. 33, 288). Finally, the ALJ made note of several factors which ALJs should consider when giving weight to a physician's opinion, including the length and extent of the treatment relationship, supportability, consistency, and specialization. (Tr. 30-40). The ALJ thus gave good reasons for the little weight given to Dr. Chang's opinion, and well supported his RFC finding in terms of both physical and mental limitations through accurate and holistic consideration of the medical record. While the ALJ did not so justify his decision, the Commissioner correctly notes that Dr. Chang's opinion is defective because of its "check-the-box" nature, which offers practically no justification for his conclusions, and thus does not constitute a medical opinion. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014). The ALJ thus properly justified the little weight given to Dr. Chang's opinion. The ALJ's RFC is supported by substantial evidence, and should not be overturned.

The ALJ's credibility finding is also supported by ample evidence. The ALJ found that Spelic's assertions of pain were "so extreme as to be appear implausible," noting the conservative treatment for her physical ailments, her ability to climb stairs into her apartment, and the disparity between her alleged inability to lift any weight with her left hand and physician findings of moderate strength retention in her left hand. (Tr. 35). The ALJ also made note of Dr. Van Horn's finding that Spelic did not put forth sufficient effort to generate valid results in her neuropsychiatric examination. (Tr. 34). Further supporting the ALJ's finding,

27

many of Spelic's physicians made some sort of notation suggesting that her asserted symptoms were inconsistent with objective evidence. Dr. Michael, for instance, noted that Spelic's asserted symptoms were "discordant" with his examination, that her allegations were not supported by "any hard findings; he recommended that she pursue only conservative therapy. (Tr. 232). Dr. Michael later noted that Spelic's asserted symptoms "did not coincide to any finding." (Tr. 230). Dr. Tong recommended only conservative therapy, despite Spelic's complaints of severe pain, finding her pain too "diffuse" to necessitate even injections. (Tr. 226-28). Dr. Mendelson found Spelic's complaints "most confusing," because her description of severe pain with "essentially all activities" did not comport with her objectively determinable ailments, which he found would not require surgery. (Tr. 258). D.O. Lustig found Spelic's condition, both physical and mental, to be "essentially unremarkable," with "no objective neurological deficits," and finding that her "symptomatologies [were] basically soft tissue in nature." (Tr. 289-90). D.O. Ryan also noted a disparity between Spelic's complaints and her actual diagnosed conditions. (Tr. 330). In short, the record contains overwhelming evidence of Spelic's tendency to exaggerate and inaccurately report her symptoms, thus the ALJ's credibility determination is well supported.

Finally, no obvious error can be found in the ALJ's findings at Step Four of the sequential analysis. As discussed above, the ALJ rendered an accurate RFC assessment which encompasses all of Spelic's well-supported limitations. The ALJ relied upon the opinion of the VE, who asserted that someone with the limitations included in the ALJ's RFC assessment would be able to perform Spelic's past relevant work as a house keeper. (Tr. 36, 68-69).

Having found no obvious errors in the ALJ's decision, the Court suggests that the ALJ's decision be upheld.

### 2.      Spelic's ADA Claims, Tort Claims, and Other Miscellaneous Claims

Spelic also mentions the ADA in her motion for summary judgment, demanding a "reasonable accommodation," references her status as "a person with a disability within the meaning of Title II of ADA," and workplace discrimination against disabled persons under the ADA. (Doc. 19 at 1-2, 4-5). The ADA was enacted in order to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Courts around the country have found that the "ADA and the disability provisions of the Social Security Act have different purposes and have no direct relationship to each other." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); Dodd v. Colvin, No. 4:13-CV-361-Y, 2014 WL 3738303, at *6 (N.D. Tex. July 29, 2014) (same); *Widener v. Astrue*, No. 08-107-DLB, 2009 WL 2778215 at *4 (E.D. Ken. Aug. 27, 2009) (same). Moreover, "the entire federal government is excluded from the coverage of the ADA." *Henrickson v. Potter*, 327 F.3d 444, 447 (5th Cir. 2003); *Haworth v. Astrue*, No. EDCV 08-1192SJORC, 2009 WL 1393678, at *6 (C.D. Cal. May 14, 2009) (holding that a Social Security disability claimant may not maintain an action sounding in contract, tort, or the ADA for denial of disability benefits). Spelic has thus failed to raise a claim pursuant to the ADA.

Similarly, Spelic asserts that she "seek [sic] damages for emotional distress and mental anguish," "negligence in screening," "unfairness in judgment discriminate the Plaintiff's employment, consequence and potentially harm future employment, result in adverse

employment," "living today with abuse, physical harm, mental anguish," and that she now suffers from "Legal Abuse Syndrome as form of post-traumatic stress disorder." (Doc. 19 at 1, 3-5). Social Security claimants may not bring damages claims pursuant to their denial of benefits. *See Schweiker v. Chilicky*, 487 U.S. 412, 424-30 (1988) (holding that tort actions resulting from denial of Social Security benefits, including claims of due process violations, cannot give rise to a constitutional tort claim); *McKenna v. Comm'r of Soc. Sec.*, 156 F.3d 1231 (6th Cir. 1998). Furthermore, claims under the Federal Tort Claims Act are precluded by the Social Security Act. *See McKenna*, 156 F.3d 1231. The Court thus lacks subject matter jurisdiction to hear negligence claims against the Commissioner. *See Kirkland v. Comm'r of Soc. Sec.*, No. 12-15035, 2013 WL 66496, at *2 (E.D. Mich. Jan. 4, 2013).

Spelic's motion for summary judgment also contains references to an "injury in fact from Michigan Law with deny legal benefits," and cites Michigan laws MCL 448.301 and "MCL 333.21777(1) on 42 CFR.483 13(C) (2)." (Doc. 19 at 1-5). The Court is unable to find any statute corresponding to the citation MCL 448.301, and in any case Spelic's unsupported citation to a statute cannot support a cause of action. Even if Spelic could raise a cause of action under such a statute, this action, which solely addresses Spelic's Social Security benefits appeal, would not be the appropriate venue for that claim. MCL 333.21777 references an extant statue under Michigan law, but that statute is totally irrelevant to Spelic's assertions and her disability appeal. The specific subsection she cites relates to a nursing home patient's temporary absence, and a nursing home's obligation to "hold the bed open for 10 days for that patient in the patient's absence." MCL § 333.21777(1). Spelic thus cannot state a claim under

30

this statute, either. Her final statutory citation is to 42 C.F.R. § 483.13; this statute relates to the regulation of long term care facilities, the specific subsection she references deals with a care facility's obligations to report abuse or neglect to the administrator of the facility. 42 C.F.R. § 483.13(C)(2). This statue thus also bears no relation to the instant action.

Having found no obvious errors in the ALJ's decision, and having found that Spelic's various other claims, citations, and assertions do not raise a claim for relief properly before the court, the Court suggests that the ALJ's decision is supported by substantial evidence. The Commissioner's motion for summary judgment (Doc. 24) should thus be granted.

### H.   Spelic's Emergency Motion and Notice

On October 22, 2015, Spelic submitted what she characterized as an "Ex Parte (emergency) Motion," within which she specified that it was an "emergency motion of domestic violence with mistreated and expertized disability clam in relation to discrimination on disability within the specified time after a deadly accident that happened on 06/20/2011." (Doc. 23 at 1). She later that her motion is "on demonstrated harm and danger with specificity determine of this case where [her] rights were discriminated in civil rights on disability under ADA." (*Id*.). Spelic also asserts in her motion, which rambles over three pages repetitive prose, "Defendant financially abused me for years, my rights have been mistreated and social security has access to all my financial and identity information." (*Id*.). Spelic also mentions her specialized vehicle, which she asserts is necessary to accommodate her impairments, suggesting that a further delay in the disposition of her benefits case could cause the loss of that vehicle. (*Id*.). Finally, she mentions that she may be evicted if she does not receive benefits

31

payments, and asserts that as a disabled person she is at greater risk for domestic abuse. (*Id*. at 3).

Insofar as the Court can reasonably determine, Spelic's emergency motion merely reasserts the same issues and claims she raised in her motion for summary judgment; she does not appear to request any form of relief other than obtaining benefits and damages against the Commissioner. As stated above, Spelic cannot obtain damages against the Commissioner, and the ALJ's decision is supported by substantial evidence. Because the Court recommends granting the Commissioner's motion for summary judgment, it also recommends that Spelic's emergency motion be denied as moot. As the Commissioner notes in her brief, Spelic also appears to have failed to comply with Local Rule 7.1(a), which requires that parties seek concurrence before filing a motion. Having already found Spelic's motion moot, the Court notes that Spelic's emergency motion could also be denied on this basis.

## I.        Spelic's Emergency Motion and Notice

On October 13, 2015, Spelic filed a "Notice," which appears to in fact be a response to the Commissioner's motion for summary judgment. (Doc. 26). In that "notice," Spelic requests "a special hearing due process," references an unknown "Individuals with Disabilities Act," and again references the ADA. (*Id*.). Attached to that notice, Spelic attaches numerous medical files and court records already in evidence, many of which she has modified through highlighting. (*Id*.). Around the middle of this packet appears a note, titled "Additional Information: page 2," apparently drafted on a typewriter, wherein Spelic asserts that she is unable to perform numerous activities, and reasserts that the Commissioner erred by denying

32

her application for benefits. (*Id.*). Spelic does not appear to raise any new issues or seek any other relief in this notice, thus it does not alter the Court's recommendation that the Commissioner's motion for summary judgment be granted.

    **J.**    **Conclusion**

For the reasons stated above, the Court **RECOMMENDS** that Spelic's Motion for Summary Judgment (Doc. 19) be **DENIED**, the Commissioner's Motion (Doc. 24) be **GRANTED**, Spelic's Emergency Motion (Doc. 23) be **DENIED AS MOOT** and that this case be **AFFIRMED**.

**III.**    <u>**REVIEW**</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th

Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 23, 2015                      S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.  A copy was also sent via First Class Mail to Larisa Nikolaeyvna Spelic at 902 North Main Street, Milford, MI 48381.

Date: November 23, 2015                      By s/Kristen Krawczyk
                                             Case Manager to Magistrate Judge Morris